UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Jenifer S. o/b/o Ronald S. (deceased),

      Plaintiff,

      v.                           Civil Action No. 2:18–cv–13–jmc

Commissioner of Social Security,

      Defendant.

## OPINION AND ORDER
(Docs. 10, 16)

Plaintiff Jenifer S. brings this action on behalf of Ronald S., deceased, pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying Ronald S.'s application for Disability Insurance Benefits (DIB).[1]  Pending before the Court are Plaintiff's motion to reverse the Commissioner's decision (Doc. 10), and the Commissioner's motion to affirm the same (Doc. 16).  Plaintiff has filed a Reply (Doc. 22), and the Commissioner has filed a Sur-Reply (Doc. 24).  For the reasons stated below, Plaintiff's motion is GRANTED, in part; the Commissioner's motion is DENIED; and the matter is REMANDED for further proceedings and a new decision.

---

[1]  For ease of reference, the Court refers to both Ronald S. and Jennifer S. as "Plaintiff," even though Ronald is deceased and Jenifer has taken over the claim on his behalf.  (*See* Doc. 10-1 at 7, ¶ 36.)

## **Background**

Plaintiff was 50 years old on his amended alleged disability onset date of November 13, 2015.  He died on November 27, 2017, while his disability application was pending.  (Doc. 10-1 at 7, ¶ 36; *see* AR 8, 9 (indicting Plaintiff was diagnosed in November 2016 with Acute Lymphoblastic Leukemia, which is not an impairment at issue in this litigation).)  He completed high school, and worked as a farmhand, a mail clerk, and a sales trainee.  He was married and had six children, ranging in ages from seven to thirty as of April 2015, two of them living with him and his wife during the relevant period.  (AR 140, 521, 589.)

Plaintiff was incarcerated from March 2009 through July 2014.  (AR 144, 325, 523.)  Nonetheless, his earnings record showed self-employment in the years 2011, 2012, and 2013, and his receipt of almost $300,000 in income during that time for his work with A&S Collection, his father's debt collection company.  (AR 144–46.)  At the administrative hearing, Plaintiff explained that this money was paid to him while he was incarcerated "so [his] wife and children had [a] means of surviving." (AR 144.)  He further explained that, even before he was incarcerated, when he was actually working at his father's company (from 2001 to 2009), although his job title was "manager," he "really didn't do a whole lot" there.  (AR 145.)  He explained that his father owned the company, and when his mother was diagnosed with cancer, his father asked him to help with the business, so Plaintiff took on the "manager" position (*id*.); but he wasn't really a manager, he just "kind of mingled around a lot," working in the mailroom, signing papers, and "every now and then [he] might make a phone call" (AR 146).

Plaintiff's last job was as a trainee at Daedalus Solar Works, a solar paneling company, where Plaintiff worked from April to November 2015. (AR 141, 162, 381.) His job duties included riding around with a salesman who sought to sell solar panels to residential and commercial buyers. (AR 142–44.) Plaintiff was supposed to receive training for the job but he stated that "never happened" and he did not make any sales. (AR 143.) Plaintiff left work at Daedalus in November 2015 because of a scheduled operation on his foot. (AR 141–42.) He did not return to work after the operation because of "problems [he had] with the operation." (AR 142.)

Plaintiff's most significant impairments were psychiatric: posttraumatic stress disorder (PTSD), depression, and paranoid personality disorder, which allegedly resulted in Plaintiff not being able to respond appropriately and being unpredictable in the workplace. (AR 137–38.) Plaintiff testified at the administrative hearing that he had a "very hard time being around anybody" and he had "panic attacks" and anxiety, which caused him to feel angry and then to "shut down" for anywhere from two days to three or four weeks. (AR 150.) Plaintiff explained that, during and after his incarceration, he was unable to trust anyone and was fearful that someone might come up behind him and try to harm or kill him. (AR 160–61.) Noting that he was not taking any medications to address these mental impairments because he had tried "a couple" and "the effects weren't good," Plaintiff stated that he saw a therapist weekly for "well over a year" and then switched to "every three to four weeks." (AR 151.)

Plaintiff also suffered from physical impairments, including problems with his right foot, requiring surgery; arthritis; back and neck pain; and a pinched nerve in his neck causing tingling and numbness in his right finger and thumb and difficulty grasping objects.  (AR 138–39, 152–54, 165–66.)

On a typical day during the alleged disability period, Plaintiff would drink coffee, throw a load of laundry in the washing machine, try to watch a little TV, sit on the porch, pick up his youngest two children at school, and bring his children to soccer in the evenings.  (AR 158–59.)  He also mowed the lawn on occasion, prepared one or two meals each week, and attended church on Sundays.  (AR 365, 367.)  When he watched his children's soccer games, he would sit far away from everyone else, sometimes even staying in his truck in an attempt to avoid people.  (AR 159–60.)

In December 2014, Plaintiff filed an application for disability insurance benefits, claiming disability starting on September 2, 2009.  (AR 279.)  Plaintiff later amended his disability onset date to November 13, 2015, the date he left work at Daedalus Solar Works due to foot problems.  (AR 136–37, 293.)  In his application, Plaintiff alleged that he was unable to work due to back injuries including floating vertebrae and two herniated discs; pinched nerves in his hip, neck, and shoulder; tennis elbow; tendinitis in his knee and ankle; and rheumatoid arthritis.  (AR 179.)  In a July 2015 Function Report, Plaintiff added that his severe PTSD also prevented him from working.  (AR 363.)  And a few months later, in September 2015, Plaintiff amended his application to include allegations that he was unable to work due to PTSD and depression, claiming that these impairments had "escalated since [his]

last contact with [the Social Security Administration]." (AR 375.) Plaintiff also noted at that time that he was scheduled to have foot surgery and knee surgery in the near future, and that he had recently had a four-day hospital stay for his severe pancreatitis. (*Id.*)

Plaintiff's application was denied initially and upon reconsideration, and he timely requested an administrative hearing. On October 4, 2016, Administrative Law Judge (ALJ) Joshua Menard conducted a hearing on the application. (AR 131–74.) Plaintiff appeared and testified, and was represented by counsel. A vocational expert (VE) also testified at the hearing. On February 13, 2017, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act from his amended alleged disability onset date of November 13, 2015 "through the date of expiration of [Plaintiff's] insured status on December 31, 2015." (AR 81.) Thereafter, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–7.) Having exhausted his administrative remedies, Plaintiff filed the Complaint in this action on January 19, 2018. (Doc. 1.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has

a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Before employing this analysis, ALJ Menard noted Plaintiff's testimony at the administrative hearing that he did not actually earn the income recorded on his Earnings Report between the years 2010 and 2013 because he was in prison during that time. (AR 72.) The ALJ stated that the issue "was referred back to the Field Office for evaluation regarding what impact, if any, . . . this would have on [Plaintiff's] date last insured," and the Field Office removed the unearned income posted to Plaintiff's earnings record. (*Id.*) This resulted in a recalculation of Plaintiff's date last insured (DLI), changing the date from December 31, 2018 to December 31, 2015. (AR 72–73 (citing AR 294–96).)

The ALJ then proceeded with the five-step sequential analysis, first determining that Plaintiff had not engaged in substantial gainful activity since his amended alleged disability onset date of November 13, 2015. (AR 73.) At step two, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease and osteoarthrosis. (*Id.*) Conversely, the ALJ found that Plaintiff's foot problems and mental impairments—including affective disorder, anxiety disorder, and substance abuse disorder—were nonsevere. (73–74.) At step three, the ALJ determined that none of Plaintiff's impairments, alone or in combination, met or medically equaled the severity of a listed impairment. (AR 75.)

Next, the ALJ determined that Plaintiff had the RFC to perform "light work," as defined in 20 C.F.R. §§ 404.1567(b), except that Plaintiff "can lift and carry and push and pull 20 pounds occasionally and 10 pounds frequently[;] and he can sit, stand[,] and walk for [six] hours in an [eight][-]hour day." (AR 75.) Given this RFC,

the ALJ found that Plaintiff was capable of performing his past relevant work as a mail clerk, i.e., "working in the large mailroom of a debt collections firm owned by his father." (AR 81.) The ALJ concluded that Plaintiff had not been under a disability from the amended alleged disability onset date of November 13, 2015 through the newly assigned DLI of December 31, 2015. (*Id.*)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*,

904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Plaintiff argues that the ALJ violated his due process right to a full and fair hearing by receiving post-hearing evidence regarding his earned income during the relevant period without notifying Plaintiff and without providing Plaintiff an opportunity to respond and supplement the record. In addition, Plaintiff claims the ALJ erred in finding that Plaintiff did not have a severe mental impairment and that Plaintiff could walk and stand for six hours in an eight-hour day. Finally, Plaintiff requests that his claim be remanded to a different ALJ. The Commissioner refutes Plaintiff's claims, contending that Plaintiff was not denied due process and that the ALJ's decision is supported by substantial evidence and free of legal error.

For the reasons discussed below, the Court finds that Plaintiff's due process rights were violated, and thus remands for further proceedings and a new decision. The Court does not, however, find that grounds exist to require remand to a different ALJ.

# I.    Due Process Violation

As of the October 4, 2016 administrative hearing, Plaintiff's earnings report indicated that he had earnings coverage for the years 2010 through 2013, which entitled Plaintiff to eligibility to Title II benefits through the end of the year 2018. (AR 287–88.)  At the hearing, as noted above, the ALJ asked Plaintiff about his earnings during these years, and Plaintiff advised that he was incarcerated from 2009 to 2014.  (AR 144–45.)  Plaintiff acknowledged that he had received almost $300,000 in income while he was in jail, explaining that this money was paid to him by his father so that his wife and children "had [a] means of surviving" during Plaintiff's incarceration.  (AR 144.)  Plaintiff stated that, prior to being incarcerated, he was employed at A&S Collection, his father's debt collection company; and his father continued to pay him after he was incarcerated, even though he was no longer doing any work for the company, so that his wife and kids were "taken care of."[2] (AR 145.)  The ALJ made no statements at the hearing indicating that this information might require an amendment to Plaintiff's earnings report and DLI,

---

[2] This was not new information to the Commissioner, as Plaintiff had advised the Social Security Administration of his incarceration and employment status at least as early as December 19, 2014, well before the October 2016 administrative hearing.  In a Social Security Administration form regarding the reporting of substantial gainful activity, a Social Security Administration representative wrote:

> Claimant insists that he has not worked at all since 3/23/3009, when he was incarcerated.  He firmly maintains that all earnings (wages [and] self-employment) on his record posted since 3/23/2009 are from his company continuing to pay him during his incarceration.  He states he was released from jail in 7/2014, again – no work since. He states he was injured during his incarceration on 9/2/2009.  If he has indeed not worked since 3/23/2009, his EPOD can be 9/2/2009.

(AR 313.)

merely stating at the conclusion of the hearing that he was "tak[ing] the matter under advisement." (AR 173.)

Nonetheless, in his decision issued about four months later, the ALJ assigned a new DLI to Plaintiff, and that new DLI significantly and explicitly contributed to the ALJ's decision to deny disability benefits. (AR 72–73, 80–82.) The ALJ stated as follows with respect to his post-hearing assignment of a new DLI to Plaintiff:

> During the hearing, [Plaintiff] testified [that] he did not actually earn the income noted on his earnings report between the years of 2010 – 2013, because he was in prison during that time. The issue was referred back to the Field Office for evaluation regarding what impact, if any, . . . this would have on [Plaintiff's] date last insured. The Field Office removed the unearned income posted to [Plaintiff's] earnings record, which resulted in a recalculation of [Plaintiff's] date last insured. The resulting recalculation changed [Plaintiff's] date last insured from December 31, 2018 to December 31, 2015.

(AR 72–73 (citations omitted).) A comparison of the Earnings Records prepared on February 8, 2016 (about eight months before the administrative hearing) and on January 6, 2017 (about three months after the administrative hearing) reveals that the more recent Earnings Record—in contrast to the original Earnings Record—contains no earnings for the years 2010 through 2013 and establishes a new DLI that is three years earlier than the DLI indicated on the original Earnings Record. (*Compare* AR 287–89, 294–96.) The ALJ proceeded in his analysis with this new information, ultimately finding that Plaintiff was not disabled as of December 31, 2015, largely due to the fact that the applicable treating source opinions did not relate back to that date. (AR 80–81.)

The Court finds that the procedure followed in this case, with respect to changing the DLI post-hearing without adequate notification to Plaintiff and

without affording Plaintiff an opportunity to supplement the record and attend another hearing, violated Plaintiff's due process right to a full and fair hearing after supplementation of the record. *See Townley v. Heckler*, 748 F.2d 109, 114 (2d Cir. 1984) ("The interest of an individual in continued receipt of [Social Security disability benefits] is a statutorily created 'property' interest protected by the Fifth Amendment." (alteration in original) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976))); *Gullo v. Califano*, 609 F.2d 649, 650 (2d Cir. 1979) ("Social Security claimants must receive a reasonable opportunity for a fair hearing, and, if a hearing is held, the Secretary's decision must be based upon evidence adduced at the hearing." (internal citations and quotation marks omitted)); *see also* Social Security Administration's Hearings, Appeals and Litigation Law Manual (HALLEX) I-2-7-1(B) (last update 4/1/16) ("When an administrative law judge . . . receives additional evidence after the hearing from a source other than the claimant or the appointed representative, if any, and the ALJ proposes to admit the evidence into the record, he or she will proffer the evidence to the claimant and appointed representative, if any."). In *Townley*, 748 F.2d at 114, the Second Circuit found that the claimant was denied his due process right to cross-examine a vocational expert and present rebuttal evidence where the ALJ had used a post-hearing vocational report as the primary evidence to deny benefits. Similarly, in *Gullo*, 609 F.2d at 650, the Second Circuit held that the claimant's due process rights were violated where the ALJ ordered the claimant to submit to a post-hearing examination by an orthopedist and then relied on the report of that examination to deny benefits. The court explained:

"The procedures utilized in the case at bar denied the claimant any opportunity to rebut [the orthopedist's] report, and, since the [ALJ's] substantial reliance upon the . . . report is clear, due process has been denied." *Id.*

Like in *Townley* and *Gullo*, here, the ALJ improperly denied disability benefits to Plaintiff based on evidence received after the administrative hearing. Specifically, the ALJ's decision denying benefits to Plaintiff was made in reliance on a DLI that was substantially different than the DLI relied on at the administrative hearing and that was assessed based on an Earnings Record that was created after the administrative hearing. The ALJ should have attempted to collect new medical opinion evidence and should have held a second hearing after the DLI was changed due to the discovery at the first hearing that Plaintiff did not have any earnings in the years 2010–2013. Instead, the ALJ obtained a new Earnings Record, changed the DLI in reliance on that Record, and decided Plaintiff's claim based on the new DLI. As noted above, the ALJ's decision to deny benefits was a direct consequence of the new DLI, as the ALJ gave "little weight" to each applicable treating source opinion because it "does not purport to relate back to the expiration of insured status in December 2015." (AR 80–81.) The ALJ essentially summarily disregarded the opinions of multiple treating providers, including Christine Hayner, MSW, LADC; Christina Harlow, DNP; Paul Smith, DPM; and Kevin Kerin, MD, almost exclusively based on the timing of their opinions in relation to Plaintiff's DLI. (*Id.*) Had Plaintiff known the ALJ was going to rely on a DLI that was three years earlier than the one both parties made their arguments in reliance on at the administrative hearing, he could have sought more contemporaneous opinions from his treating

providers as well as other evidence of his alleged disability prior to the new DLI. *See Mathews*, 424 U.S. at 348 ("The essence of due process is the requirement that a person in jeopardy of serious loss [be given] notice of the case against him and [the] opportunity to meet it." (internal quotation marks omitted)); *Wallace v. Bowen*, 869 F.2d 187, 193 (3d Cir. 1989) ("[W]hen an [ALJ] chooses to go outside the testimony adduced at the hearing in making a determination on a social security claim, the ALJ must afford the claimant not only an opportunity to comment and present evidence but also an opportunity to cross-examine the authors of any post-hearing reports when such cross-examination is necessary to the full presentation of the case, and must reopen the hearing for that purpose if requested.").

Despite the Commissioner's claims to the contrary, consideration of the notice that was sent to Plaintiff on December 11, 2016—which advised Plaintiff that the Commissioner had changed its records to show no employment earnings for Plaintiff in the years 2010 through 2013—does not change the analysis. (*See* Doc. 17-1, Ex. 1.) But before the Court can consider the notice, it must determine whether the Commissioner has properly submitted it (and the Declaration describing it) into evidence. (*Id.*; *see also* Doc. 17.)

Pursuant to 42 U.S.C. § 405(g), "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner . . . , but only upon a showing that there is new evidence[,] which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." In applying this regulation, the Second Circuit has developed a three-part test, allowing supplementation of the record where evidence is:

> (1) new and not merely cumulative of what is already in the record . . .[; and] (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative . . .[; and (3) where there is] good cause for [the] failure to present the evidence earlier.

*Lisa v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991) (internal quotation marks and citations omitted) (quoting *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988)). Applied here, first, the notice is "new," as it was not a part of the record until it was filed with the Court on October 18, 2018. Second, the notice is relevant and probative, as it: (a) summarizes the revised earnings record, which resulted in a new DLI that substantially affected the ALJ's decision in this matter; and (b) reflects that Plaintiff was notified of the new earnings record before the ALJ issued his decision, potentially refuting Plaintiff's due process argument. Third, there was good cause for the Commissioner not to submit the notice earlier, as Plaintiff did not raise his due process argument until the filing of his motion in this litigation.

Therefore, the Court finds that the notice meets the criteria for "new and material" evidence warranting inclusion in the record. Nonetheless, the notice does not change the Court's above analysis and conclusion that Plaintiff was deprived of his right to due process, because not only does the notice fail to advise Plaintiff that his *DLI* was being changed, it also fails to advise Plaintiff that (and specifically, how) the new DLI would affect the ALJ's decision on Plaintiff's disability claim to Plaintiff's detriment. (*See* Doc. 17-1, Ex. 1 at 2 (advising merely that "we changed our records to show the following amounts for the employment you asked us about," and listing no earnings for the years 2011 through 2013).) Although the notice

advises Plaintiff of his "right to appeal" the alteration to his earnings record, allowing him 60 days to appeal in writing (*id.*), Plaintiff should have been allowed an opportunity to revise his claim, supplement the record, and attend a supplemental hearing given the Commissioner's assignment of a new DLI after the initial administrative hearing.  Remand is required for this procedure to take place.

On remand, the issue of Plaintiff's earnings record during the years he was in prison (2009 through 2014) may also be further developed, if Plaintiff contends he has valid earnings during those years.  (*See* Doc. 10-1 at 14–15 ("An individual could receive earnings while incarcerated, either as a member of a family owned business or through self-employment with his wife so that the mere fact that [Plaintiff] was incarcerated does not mean that his earnings for those periods was wrong.").)

## II.  Severity of Mental Health Impairments

Plaintiff next contends the ALJ erred in finding that Plaintiff had no severe mental health impairments at step two of the sequential analysis.  Given the remand of this matter for the due process concerns discussed above, the Court need not address this issue: once the claim is remanded and Plaintiff is afforded an opportunity to argue his claim in lieu of the amended DLI, the ALJ will be required to reconsider the claim at each step of the analysis, including at step two. Nonetheless, the Court finds that the ALJ erred in failing to find that Plaintiff's mental impairments met this step's *de minimis* severity requirement.

The claimant bears the burden at step two of the sequential evaluation to establish that his or her impairment is "severe," meaning it "significantly limit[s] [his or her] physical or mental ability to do basic work activities."  20 C.F.R.

§§ 404.1520(c); 404.1521(a). Despite this strong language, the step-two severity assessment "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)). To that end, Social Security Ruling (SSR) 85-28 provides: "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the [claimant's] physical or mental ability(ies) to perform basic work activities." 1985 WL 56856, at *3 (1985). The Ruling further states: "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at this step when medical evidence establishes *only a slight abnormality or a combination of slight abnormalities[,] which would have no more than a minimal effect on an individual's ability to work*." *Id.* (emphasis added) (citing 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), 416.921); *see also* SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) ("The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out totally groundless claims." (internal quotation marks omitted)).

The ALJ erred in finding that Plaintiff did not have a severe mental impairment, as substantial evidence demonstrates that Plaintiff's mental impairments caused more than a slight abnormality and had more than a minimal effect on his ability to perform basic work activities during the alleged disability period, even if that period expired on the earlier new DLI of December 31, 2015. Specifically, one agency consultant and two treating medical sources opined that

Plaintiff had severe mental impairments around the relevant period. In April 2015 (approximately eight months prior to the December 2015 DLI), examining agency consultant Gregory Korgeski, PhD, opined that Plaintiff suffered from severe PTSD, major depressive disorder, and paranoid personality features or disorder. (AR 525.) Dr. Korgeski noted that Plaintiff was "socially very ill at ease and tense" during his examination, "look[ing] startled in the waiting room"; having a "staring appearance"; speaking only in short sentences; and appearing hypervigilant, wary, and "passively angry." (AR 523.) Dr. Korgeski summarized Plaintiff's mood as appearing "tense, angry, [and] dysphoric," with a "blunted" affect and "highly rigid and constricted" thinking. (AR 524.) Almost inexplicably, the ALJ gave "great weight" to these opinions while at the same time finding that Plaintiff had no severe mental impairments. (AR 74–75, 80.)

In August 2016 (approximately eight months after the December 2015 DLI), treating social worker and therapist Christine Hayner, MSW (master of social work), LADC (licensed alcohol and drug counselor), opined that Plaintiff would likely have difficulty responding appropriately to coworkers, supervisors, and the general public, explaining that his inappropriate responses "would be varied and unpredictable on a day[-]to[-]day basis due to the severity of triggered symptoms." (AR 809.) Hayner also opined that Plaintiff had a "[l]ow threshold and [a] poor response to stress" (*id.*); and that, due to his PTSD, major depressive disorder, and paranoid personality disorder, Plaintiff experienced "severe difficulty in . . . ability to function on a daily basis" and "varied and unpredictable responses to internal and external triggers in a work[-]related environment" (AR 811).

Also in August 2016, Plaintiff's treating primary care provider, Christina Harlow, DNP (doctor of nursing practice) submitted a letter stating that Plaintiff carried diagnoses of PTSD, major depressive disorder, and paranoid personality disorder; and that Plaintiff was seeing a therapist regularly for these conditions. (AR 943.)  Harlow further stated that Plaintiff was "unable to get adequate sleep." (*Id.*)  Although noting that Hayner was better suited to opine on the severity of Plaintiff's mental health impairments because she was a specialist and had a longer and more frequent treatment relationship with Plaintiff, Harlow opined that Plaintiff's mental health symptoms "are severe and debilitating to him."  (*Id.*)  About a month later, in September 2016 (approximately nine months after the December 2015 DLI), Harlow opined that the effects of Plaintiff's "severe PTSD [and] hyper-alert behavior with paranoia," as well as his difficulty concentrating for any length of time, would result in Plaintiff needing more than ordinary rest breaks and being off-task for more than 20% of an eight-hour workday.  (AR 1134–35.)  Harlow further stated that Plaintiff's paranoia and inability to sleep "would suggest frequently missing work."  (AR 1137.)

Despite these opinions from two treating sources and one examining agency consultant—each finding, irrespective of one another, that Plaintiff was severely limited in his ability to function due to his mental impairments—the ALJ found that Plaintiff had no severe mental impairment or combination of mental impairments. (AR 73–75.)  In making this finding, the ALJ improperly "substitute[d] his own judgment" for that of competent medical professionals.  *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[W]hile an [ALJ] is free to resolve issues of credibility as to

lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." (alterations in original) (internal quotation marks omitted)). As noted earlier, the ALJ's primary reason for giving "little weight" to the opinions of Hayner and Harlow was that their opinions do not "purport to relate back to the expiration of insured status in December 2015."[3] (AR 80–81.) But Hayner noted in her opinion that Plaintiff's level of function "has remained consistent in presentation" since June 2013. (AR 812.) And in a January 28, 2016 treatment note, which is only about a month after the new DLI in December 2015, Hayner recorded that Plaintiff had severe depression and PTSD. (AR 589.) As for Harlow, in response to a question asking whether Plaintiff's ability to function was any different since September 2009, she stated that she did not know him then but "his condition is unchanged since I have known him," which was since January 2016, only one month after the new DLI. (AR 1138; *see* AR 943.)

The ALJ's focus on the failure of these medical opinions to explicitly "relate back" to the period before the new DLI is unsupported, as the Second Circuit has

---

[3] The ALJ also found that Hayner's opinions were worth only "little weight" because "[Plaintiff] was working until November 2015 when he had to stop for surgery on his foot and not because of any mental health issues." (AR 80.) The record does not support this assessment, as Plaintiff's job as of November 2015 required very little from a functional mental health standpoint. As discussed earlier, Plaintiff testified that, from April to November 2015, he was a trainee at Daedalus Solar Works, a solar paneling company, where his job duties included riding around with a salesman who attempted to sell solar panels to residential and commercial buyers. (AR 142–44, 162.) Plaintiff explained that he was supposed to be getting trained for the job, but "it never happened" and he never made any sales and had only very limited interaction with customers. (AR 143.) He further stated that the owner of the company was "a good friend of mine, and I think he was more or less trying to help me out financially than really giving me a job." (AR 142.) Plaintiff could have had severe mental impairments just prior to his new DLI in December 2015, notwithstanding his ability to do this job a month earlier in November 2015. (*See* Doc. 22 at 8–9.)

held that the "'diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment,' and by a physician who had not theretofore treated the claimant." *Parker v. Harris*, 626 F.2d 225, 232 (2d Cir. 1980) (quoting *Stark v. Weinberger*, 497 F.2d 1092, 1097 (7th Cir. 1974)); *see Messina v. Comm'r of Soc. Sec. Admin.*, 17-1598-cv, 2018 WL 4211602, at *3 (2d Cir. Sept. 5, 2018); *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) ("[W]hile a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence." (internal quotation marks omitted)); *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981). The Fourth Circuit has similarly held, stating: "Medical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012). Neither Hayner's nor Harlow's opinions are contradicted by other reliable medical evidence in the record, and they are consistent with not only each other but also with the opinions of Dr. Korgeski, which were made in April 2015, approximately eight months *prior* to the new DLI. The record does not support the proposition that Plaintiff's mental impairments were severe beginning in January 2016 or sometime shortly thereafter, but not before then. Rather, there is substantial evidence, including the medical opinions

noted above, indicating that Plaintiff had severe mental impairments prior to December 2015. (*See, e.g.*, AR 523–25, 540, 545–46, 549, 809, 812.)[4]

For these reasons, the ALJ erred in finding that Plaintiff did not have a severe mental impairment or combination of impairments prior to the new DLI of December 31, 2015.

## III.    Lower Extremity Problems

Plaintiff also contends that the ALJ erred in finding that Plaintiff was able to walk and stand for six hours in an eight-hour workday. As with the above issue, the Court need not address it, given that the ALJ will reconsider it on remand, after supplementation of the record and a new hearing. The Court merely notes, for the purpose of providing guidance on remand, that Plaintiff clearly had significant

---

[4] The Court summarily rejects the Commissioner's argument that Hayner's opinions are "uncorroborated by [her own] office notes contemporaneous to the period at issue" (Doc. 16 at 9), as the ALJ did not make this finding. In fact, the ALJ does not mention the consistency or supportability of either Hayner's or Harlow's opinions in his decision. Rather, as noted above, the ALJ gave little weight to Hayner's opinions solely on the grounds that they did not "relate back to the expiration of [Plaintiff's] insured status in December 2015," and that Plaintiff was working until November 2015 and had to stop only because of problems with his foot and not mental health problems. (AR 80.) It is well settled that "[the court] may not 'affirm an administrative action on grounds different from those considered by the agency.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 89 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)); *see Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943)). The Commissioner also supports the ALJ's decision to give little weight to the opinions of both Hayner and Harlow by pointing out that neither provider is an "acceptable medical source under the Commissioner's regulations and rulings." (Doc. 16 at 9.) Although true, the ALJ did not make this finding with respect to Hayner. (AR 80.) The ALJ did, correctly, state that Harlow "is not an acceptable medical source" (*id.*), but that merely meant the ALJ could not afford "controlling weight" to Harlow's opinions, 20 C.F.R. § 404.1527(c)(2); he was still required to provide a reasonable explanation for his decision to afford limited weight to Harlow's opinions, given Harlow's status as an "other source" who treated Plaintiff during the relevant period, *see, e.g., Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010); SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006) (stating that, in addition to evidence from "acceptable medical sources," ALJs may use evidence from "other sources"––who "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists" and who "are important and should be evaluated on key issues such as impairment severity and functional effects"—to show the severity of a claimant's impairments).

problems with his right foot prior to November 2015, when he had surgery on the foot. (AR 941.) Although his postoperative recovery went well, Plaintiff reinjured his foot in January and February 2016, and was thereafter noted to have reduced range of motion and increased pain and swelling on examination. (*Id.*) In August 2016, Paul Smith, DPM (doctor of podiatric medicine), the podiatrist who performed Plaintiff's foot surgery and treated Plaintiff's related foot issues, opined that Plaintiff would need to elevate and rest his right leg after standing or walking for more than 30 minutes; and would be limited to standing and walking for a total of between two and six hours in an eight-hour workday with limitations in lower extremity pushing and pulling. (AR 941–42.) The ALJ rejected these opinions, again, on the basis that they related to a period after the DLI. (AR 80.) But some parts of the opinions do in fact discuss the period prior to December 31, 2015. (*See* AR 941.) Moreover, on remand, Plaintiff will be given an opportunity to obtain a revised opinion from Dr. Smith (and any other relevant providers), specifically discussing Plaintiff's ability to stand and walk prior to the new DLI of December 31, 2015, or to argue why Dr. Smith's August 2016 opinion applies to the applicable disability period.

## IV. Remand to a Different ALJ

Finally, Plaintiff requests that the Court remand this matter to a different ALJ, asserting that "the ALJ in this case has shown a complete disregard for [Plaintiff's] due process rights and has failed to provide a full and fair hearing." (Doc. 22 at 12; *see* Doc. 10–1 at 23.) The Court denies this request, as there is no

indication that ALJ Menard engaged in conduct warranting remand to a different ALJ. *See Johnson v. Astrue*, Civil No. 3:10-CV-1023 (VLB), 2011 WL 2938074, at *2 (D. Conn. Feb. 15, 2011) ("[W]hen the conduct of an ALJ gives rise to *serious concerns about the fundamental fairness of the disability review process*, remand to a new ALJ is appropriate." (emphasis added)). Specifically, there is no evidence of bias, hostility, or prejudice by the ALJ toward Plaintiff. *See Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 293 (E.D.N.Y. 2004) (remand to a new ALJ justified where ALJ exhibited "personal hostility" toward the plaintiff). Nonetheless, the Commissioner retains discretion to make an assignment to a different ALJ on remand if she so chooses. *See Johnson*, 2011 WL 2938074, at *2 (taking no position on which ALJ should be assigned to the case on remand, and noting that (a) there was "no evidence that the ALJ acted due to apparent hostility toward Ms. Johnson"; and (b) "simply failing to adhere to the appropriate legal standard during the first hearing does not clearly indicate that the ALJ would not apply the correct standard on remand").

## Conclusion

The Court finds that the Commissioner violated Plaintiff's due process right to a full and fair hearing. Prior to issuing his decision, the ALJ should have informed Plaintiff that the Commissioner had revised Plaintiff's Earnings Report and that the ALJ would in turn change Plaintiff's DLI and issue a decision in accordance therewith. Given this new information, the ALJ should have afforded Plaintiff an opportunity to supplement the record and testify at a new hearing to argue the earnings/DLI issue and, if necessary, to shift the relevant dates of his

claim to correspond with the new DLI. Furthermore, whether using the original DLI or the DLI assigned at the October 2016 administrative hearing, the Court finds that the ALJ erred in his step-two finding that Plaintiff had no severe mental impairments.

Accordingly, the Court GRANTS Plaintiff's motion (Doc. 10), in part; DENIES the Commissioner's motion (Doc. 16), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 4th day of January 2019.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge